**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| FIRST NATIONAL INSURANCE | : | |
| COMPANY OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 2:11-CV-85-RWS |
| | : | |
| DUNCAN PIPELINE, INC.; DPI | : | |
| PROPERTIES, LLC; PRECISION | : | |
| PRECAST, LLC; DPI | : | |
| EQUIPMENT COMPANY, INC.; | : | |
| DAWN M. DUNCAN; and WARD | : | |
| R. DUNCAN, | : | |
| | : | |
| Defendants. | : | |

## ORDER

This case comes before the Court on Plaintiff's Motion for Summary

Judgment [77] and Defendants' Motion for Leave to File Counterclaim [81].

After reviewing the record, the Court enters the following Order.

### Background

This suit arises out of and concerns payment bonds issued by Plaintiff

First National Insurance Company of America ("Plaintiff," "First National," or

"Surety") on behalf of Defendant Duncan Pipeline, Inc. ("Defendant" or

"Duncan") in connection with two construction projects.  Except where otherwise indicated, the following facts are undisputed.

A.     Bonds and Indemnity Agreement

Duncan entered into a subcontract agreement with Walbridge Aldinger Co. ("Walbridge") in connection with the construction of a project known as "Ft. Stewart IBCT" (the "Ft. Stewart Project").  (Pl.'s Statement Of Material Facts To Which There Is No Genuine Issue To Be Tried ("Pl.'s SMF"), Dkt. [77-2] ¶ 1.)  Under the terms of the subcontract agreement, Duncan was required to provide Walbridge with performance and payment bonds.  (Id.) Plaintiff issued Payment and Performance Bond No. 6584760 (the "Walbridge Bond"), which named Walbridge as obligee, Duncan as principal, and Plaintiff as surety.  (Id. ¶ 2.)  This is the first of two bonds that are the subject of this action.

Duncan also entered into a subcontract agreement with Bartow County, Georgia ("Bartow County") in connection with the construction of a project known as "Water System Improvements/Mission Road" (the "Bartow County Project").  (Id. ¶ 3.)  Under the terms of this subcontract, Duncan was required to provide Bartow County with performance and payment bonds.  (Id.)  Plaintiff

2

issued Payment and Performance Bond No. 6383120 (the "Bartow County Bond"), which named Bartow County as obligee, Duncan as principal, and Plaintiff as surety.  (<u>Id.</u> ¶ 4.)  This is the second bond that is the subject of this action.

As consideration and inducement for Plaintiff's issuance of the Walbridge and Bartow County Bonds, Defendants each executed a General Agreement of Indemnity for Contractors (the "Indemnity Agreement").  (<u>Id.</u> ¶ 5.)  "Under the Indemnity Agreement, Defendants agreed that each would indemnify and keep indemnified [Plaintiff] from and against any and all claims, demands and liability for losses, costs and expenses of whatsoever kind or nature, including court costs, attorneys fees, consultant fees, investigative costs, and any other losses, costs or expenses incurred by [Plaintiff] by reason of having executed any bond on behalf of [Duncan] or incurred by it on account of any default by Defendants under the Indemnity Agreement."  (<u>Id.</u> ¶ 6.)

B.    Claims on the Walbridge Bond

1.    *Consolidated*

Plaintiff received a demand for payment and a claim on the Walbridge Bond from Consolidated Pipe & Supply Company ("Consolidated") for work

3

performance or supplies delivered to Duncan in connection with the Ft. Stewart Project.  (Id. ¶ 8.)  Upon receipt of the claim from Consolidated, Plaintiff provided Duncan with a copy of the claim and requested Duncan's input regarding the claim.[1]  (Id. ¶ 9.)  Duncan reviewed and evaluated the Consolidated claim and gave Plaintiff input on the amounts due to the claimant.  (Id. ¶ 10.)  Plaintiff subsequently paid Consolidated $11,816.63 based on its own investigation and evaluation of the input provided by Duncan.[2]  (Id. ¶ 12.)

   2.   *Foley*

Plaintiff received a demand for payment and a claim on the Walbridge Bond from Foley Product Company ("Foley") for work performed or supplies delivered to Duncan in connection with the Ft. Stewart Project.  (Id. ¶ 14.)  Upon receipt of the claim, Plaintiff provided a copy of the claim to Duncan and requested Duncan's input regarding the claim.  (Id. ¶ 15.)  Duncan reviewed and evaluated the Foley claim and gave Plaintiff input regarding the amounts due to

-----

[1] Defendants purport to dispute this factual assertion on grounds that Plaintiff's citation to evidence does not support it.  (Defs.' Resp. to Pl.'s SMF, Dkt. [93] ¶ 9.)  This contention is without merit.

[2] Defendants purport to dispute this factual assertion on grounds that Plaintiff's citation to evidence does not support it.  (Defs.' Resp. to Pl.'s SMF, Dkt. [93] ¶ 12.)  This contention is without merit.

(Rev.8/82)

the claimant.  (Id. ¶ 16.)  Plaintiff paid Foley $30,990.96 based on its own investigation and evaluation of Duncan's input regarding the claim.[3]  (Id. ¶ 17.)

### 3.    Thompson

Plaintiff received a demand for payment and a claim on the Walbridge Bond from Thompson Pump Manufacturing Company ("Thompson") for work performed or supplies delivered to Duncan in connection with the Ft. Stewart Project.  (Id. ¶ 19.)  Upon receipt of the claim, Plaintiff provided Duncan with a copy of the claim and requested Duncan's input regarding the claim.  (Id. ¶ 20.) Duncan reviewed and evaluated the Thompson claim and gave Plaintiff input regarding the amounts due to the claimant.  (Id. ¶ 21.)  Plaintiff paid Thompson $3,361.36 based on its own investigation and evaluation of Duncan's input regarding the claim.  (Id. ¶ 22.)

### 4.    Mainline

Plaintiff received a demand for payment and a claim on the Walbridge Bond from Mainline Supply Company ("Mainline") for work performed or supplies delivered to Duncan in connection with the Ft. Stewart Project.  (Id.

---

[3] Defendants purport to dispute this factual assertion on grounds that Plaintiff's citation to evidence does not support it. (Defs.' Resp. to Pl.'s SMF, Dkt. [93] ¶ 17.) This contention is without merit.

¶ 25.)  Upon receipt of the claim, Plaintiff provided Duncan with a copy of the claim and requested Duncan's input regarding the claim.  (Id. ¶ 26.)  Duncan reviewed and evaluated the claim and gave Plaintiff input regarding amounts due to the claimant.  (Id. ¶ 27.)  Plaintiff paid Mainline $467,169.92 based on its own investigation of the claim and evaluation of Duncan's input.[4]  (Id. ¶ 28.)

> C.      Claim on the Bartow County Bond

> > 1.      *Mainline*

Plaintiff also received a demand for payment and a claim from Mainline on the Bartow County Bond for work performed or supplies delivered to Duncan in connection with the Bartow County Project.[5]  (Id. ¶ 30.)  Upon

---

[4] Defendants purport to dispute this fact on grounds that Plaintiff's citation to evidence does not support it.  (Defs.' Resp. to Pl.'s SMF, Dkt. [93] ¶ 28.)  This contention is without merit.

[5] In its statement of material facts, Plaintiff states that it received this demand for payment and claim from Mainline "on the Walbridge Bond . . . for work performed or supplies delivered to [Duncan] on the Bartow County Project."  (Pl.'s SMF, Dkt. [77-2] ¶ 30 (emphasis added).)  This appears to be a typographical error, however, as Plaintiff refers to the Bartow County Project (rather than the Ft. Stewart Project), and as the evidence cited in support of this fact refers to Mainline's claim and demand pursuant to the "Bartow County Bond."  (See Aff. of Jason Stonefeld in Supp. of Mot. for Summ. J. ("Stonefeld Aff."), Dkt. [78] ¶ 10 ("[Plaintiff] received a demand for payment and claim from [Mainline] on an additional bond, the Bartow County Bond, for supplies it delivered to [Duncan] on the Mission Road Project.").) (See also Pl.'s SMF, Dkt. [77-2] ¶ 31 ("Upon receipt of the claim from [Mainline] on the Bartow County Bond . . . .").)

receipt of the claim from Mainline on the Bartow County Bond, Plaintiff

provided Duncan with a copy of the claim and requested Duncan's input

regarding the claim.  (Id. ¶ 31.)  Duncan gave Plaintiff input regarding the

amounts due to the claimant.[6]  (Id. ¶ 32.)  Plaintiff paid Mainline $266,250.00

based on its own investigation and evaluation of Duncan's input.[7]  (Id. ¶ 33.)

> D.     Indemnification

As of June 4, 2012, Plaintiff has incurred $51,853.48 in attorneys fees,

costs, and expenses as a result of issuing the bonds, settling the claims on the

bonds, and enforcing the Indemnity Agreement.[8]  (Id. ¶ 35.)  Plaintiff has also

incurred consultant fees in the amount of $8,327.14 as a result of issuing the

bonds.[9]  (Id. ¶ 36.)  "[Plaintiff] provided [Duncan], Dawn Duncan, and Ward

---

[6] Defendants purport to dispute this factual assertion on grounds that Plaintiff's citation to evidence does not support it.  (Defs.' Resp. to Pl.'s SMF, Dkt. [93] ¶ 32.) This contention is without merit.

[7] Defendants purport to dispute this factual assertion on grounds that Plaintiff's citation to evidence does not support it.  (Defs.' Resp. to Pl.'s SMF, Dkt. [93] ¶ 33.) This contention is without merit.

[8] Defendants purport to dispute the foregoing factual assertion on grounds that (1) Plaintiff's citation to evidence does not support it and (2) the assertion "call[s] for a legal conclusion as to the meaning of the Indemnity Agreement."  (Defs.' Resp. to Pl.'s SMF, Dkt. [93] ¶ 35.)  These contentions are without merit.

[9] Defendants object to this assertion on the same grounds as are stated in footnote 8, supra.  (Defs.' Resp. to Pl.'s SMF, Dkt. [93] ¶ 36.)  Defendants' objections

AO 72A
(Rev.8/82)

Duncan with a statement of the amounts it paid to each bond claimant, as well as the costs, fees and expenses that [Plaintiff] has incurred as a result of issuing the bonds on behalf of [Duncan] and demanded that Defendants indemnify [Plaintiff] for its losses." (Id. ¶ 37.)  None of the Defendants has paid any money to Plaintiff under the Indemnity Agreement. (Id. ¶ 38.)  Accordingly, Plaintiff initiated this action to recover from Defendants the costs, fees, and expenses Plaintiff has incurred as a result of issuing the Bonds, pursuant to the terms of the Indemnification Agreement. (See generally Compl., Dkt. [1].)

## Discussion

### I.      Plaintiff's Motion for Summary Judgment [77]

#### A.      Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

are without merit.

8

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the Court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations

omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met

its burden under Rule 56(a), the nonmoving party "must do more than simply

show there is some metaphysical doubt as to the material facts").

B.    Analysis

Plaintiff contends it is entitled to summary judgment under the plain

terms of the Indemnification Agreement.  (See generally Pl.'s Br. in Supp. of

Mot. for Summ. J. ("Pl.'s Br."), Dkt. [77-1].)  The Indemnification Agreement

provides, in pertinent part, as follows:

With respect to claims against Surety:

1.    Surety shall have the exclusive right for itself and
[Defendants] to determine in its sole and absolute
discretion whether any claim or suit upon any Bond
shall, on the basis of belief of liability, expediency or
otherwise, be paid, compromised, defended or
appealed.

2.    Surety may incur such expenses, including reasonable
attorneys' fees, as deemed necessary or advisable in

10

the investigation, defense and payment of such claims
and completion of any Contract with respect to which
Surety has issued any Bond.

(Stonefeld Aff., Ex. C (Indemnification Agreement), Dkt. [78-3] at 2 of 11.)

The Indemnification Agreement further provides, with respect to claims against

Surety, that:

> 3.     Surety's determination in its sole and absolute
> discretion of the foregoing shall be final and
> conclusive upon [Defendants].

> 4.     An itemized statement of loss and expense incurred
> by Surety, sworn to by an officer of Surety, shall be
> prima facie evidence of the fact and extent of the
> liability of [Defendants] to Surety in any claim or suit
> by Surety against [Defendants].

(Id.)

With respect to Defendants' obligation to indemnify Surety, the

Indemnification Agreement provides:

[Defendants] agree to pay to Surety upon demand:

> 1.     All loss, costs and expenses of whatsoever kind and
> nature, including court costs, reasonable attorney fees
> (whether Surety at its sole option elects to employ its
> own attorney, or permits or requires Undersigned to
> make arrangements for Surety's legal representation),
> consultant fees, investigative costs and any other
> losses, costs or expenses incurred by Surety by reason

11

> of having executed any Bond, or incurred by it on
> account of any Default under this agreement by any of
> the Undersigned . . . .

(Id.)

Plaintiff contends that it is entitled to indemnification from Defendants under the plain language of the provisions cited above.  To this end, Plaintiff has presented evidence that it gave Defendants a copy of each claim made under the Bonds, solicited Defendants' input regarding amounts that should be paid to each claimant, and, finally, provided Defendants with an itemized statement of the amounts it paid to each bond claimant, as well as the costs, fees and expenses it incurred as a result of issuing the Bonds.  Thus, Plaintiff argues, Defendants are obligated to indemnify Plaintiff under the Indemnification Agreement.

The Georgia Court of Appeals "consistently has upheld the validity and enforceability of indemnification agreements executed in connection with the issuance of surety bonds."  Anderson v. United States Fidelity & Guar. Co., 600 S.E.2d 712, 715 (Ga. Ct. App. 2004).  "When interpreting such agreements, [Georgia courts] apply the ordinary rules of contract construction."  Id.  "No construction is required or even permissible when the language employed by

the parties in the contract is plain, unambiguous and capable of only one reasonable interpretation." Id. (internal quotes and citation omitted).

The Court finds that Plaintiff has stated a prima facie case of Defendants' liability under the Indemnification Agreement.  Indeed, Defendants do not dispute the validity of the Indemnification Agreement, the claims made under the Bonds, or the amounts Plaintiff paid to settle those claims.  (See generally Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. ("Defs.' Opp'n"), Dkt. [94].)  Defendants nonetheless dispute their liability under the Indemnification Agreement, arguing, first, that Plaintiff acted in bad faith, thus voiding the Indemnification Agreement, and, second, that Plaintiff failed to mitigate its damages.  (See generally id.)  The Court considers these arguments in turn.

### 1.    Bad Faith

As stated above, under the Indemnification Agreement, Plaintiff was given the "exclusive right" to determine, in its "sole and absolute discretion," whether claims made under the Bonds would be defended, compromised, or paid.  (Stonefeld Aff., Ex. C (Indemnity Agreement), Dkt. [78-3] at 2 of 11.) Under Georgia law, "[w]here a decision is left to the discretion of a designated entity, the question is not whether it was in fact erroneous, but whether it was in

13

bad faith, arbitrary or capricious so as to amount to an abuse of that discretion."
Nguyen v. Lumbermens Mut. Cas. Co., 583 S.E.2d 220, 223 (Ga. Ct. App.
2003) (internal quotes and citation omitted). "Bad faith is not simply bad
judgment or negligence, but it imports a dishonest purpose or some moral
obliquity, and it implies conscious doing of wrong, and means breach of known
duty through some motive of interest or ill will."  Id. (internal quotes and
citation omitted).  Because Plaintiff has established its prima facie case, to
avoid summary judgment, Defendants must show that Plaintiff acted in bad
faith or abused its discretion in paying the claims under the Bonds.  Anderson,
600 S.E.2d at 715; Arch Ins. Co. v. Douglas Asphalt Co., No. CV507-038, 2009
WL 1873801, at *7 (S.D. Ga. June 29, 2009).

Defendants put forward several arguments to show that Plaintiff acted in
bad faith.  (Defs.' Opp'n, Dkt. [94] at 7-15.)  First, Defendants contend that
Plaintiff was an undisclosed dual agent, representing both Duncan and
Walbridge (id. at 7-9); second, that Plaintiff shared confidential information
with Walbridge and otherwise acted contrary to Duncan's interests (id. at 10-
14); and, finally, that Plaintiff held a fiduciary relationship with Duncan and

14

breached its fiduciary duties of loyalty and good faith (id. at 14-15).  The Court

considers these arguments, in turn.

### i.      Dual Agency

Defendants first contend that Plaintiff was an undisclosed dual agent,

acting on behalf of both Duncan and Walbridge.  (Id. at 7-10.)  The following

principles apply with respect to dual agents:

> The law imposes upon every agent the obligation to exercise, for
> and in behalf of his principal, skill, loyalty, and absolute good
> faith.  It is of the essence of the contract of the agent that he will
> use his best skill and judgment to promote the interest of his
> employer.  This the agent cannot do if he is the agent for both
> parties.  To represent both parties as their agent is to undertake
> inconsistent duties. . . .  He thus commits a fraud on his principals
> in undertaking, without their consent or knowledge, to act as their
> mutual agent. . . .
>
> Where an agent without the full knowledge and consent of his
> principal represents the adverse party in a transaction, his contracts
> relating thereto are voidable at the option of the principal. . . .  In
> the case of a contract executed in whole or in part such defrauded
> principal may by acting promptly and before the rights of innocent
> parties have intervened, upon restoration of any benefit which he
> has received, rescind the contract and recover back the property or
> rights with which he has parted under it.

Remediation Servs., Inc. v. Georgia-Pacific Corp., 433 S.E.2d 631, 634 (Ga. Ct.

App. 1993).

15

In support of their argument that Plaintiff was an undisclosed dual agent, Defendants show that Liberty Mutual Surety Group manages performance and payment bond claims for both Plaintiff and Liberty Mutual Insurance Company. (Defs.' Statement of Additional Material Facts Which Present An Issue For Trial ("Defs.' Statement of Additional Facts"), Dkt. [95] ¶ 5.)  Plaintiff is a wholly owned subsidiary of Liberty Mutual Insurance Company.  (Id. ¶ 6.) Liberty Mutual Insurance Company issued a performance and payment bond naming Walbridge as principal related to work to be performed at Ft. Stewart (id. ¶ 7), while Plaintiff issued Duncan a bond related to work to be performed at Ft. Stewart.  Defendants argue that this constitutes an impermissible dual agency, precluding Plaintiff from obtaining indemnification: "[Plaintiff] is not entitled to indemnity as a matter of law because Liberty Mutual Surety, on behalf of [Plaintiff], acted as an undisclosed double agent for [Walbridge] and [Duncan], which voided any indemnity obligation [Duncan] owes [Plaintiff] . . . ."  (Defs.' Opp'n, Dkt. [94] at 2.)  (See also id. at 8-9 ("[Duncan] was never told or otherwise informed, prior to the first bond claim in September 2010, that Liberty Mutual Group managed performance and payment claims for both Walbridge's bond issued by Liberty Mutual Insurance Company and

16

[Duncan]'s bond issued by [Plaintiff] related to work to be performed at Ft. Stewart.").)

Plaintiff argues that "[t]here is no evidentiary basis" to support Defendants' allegation that Plaintiff was an agent of Walbridge.  (Pl.'s Reply, Dkt. [100] at 12.)  The Court agrees.  As Plaintiff argues:

> Walbridge's indemnity agreement is not in the record and there is no evidence of payment of claims on Walbridge's bond.  The Surety, Plaintiff here, did not have any contract or agreement with Walbridge and never received, investigated, or paid any claim against Walbridge's bond. . . .  The sureties have always been separate and distinct entities.  Claims on payment bonds were routed by the respective separate underwriting agency offices, and different claims representatives handled claims out of different offices.

(Id. (citing Stonefeld Dep., Dkt. [89] at 18, 126).)  In short, Defendants have failed to show that Plaintiff had competing obligations to Duncan and Walbridge so as to be a dual agent.  The Court, therefore, cannot find, on this basis, that Plaintiff acted in bad faith in paying the Bond claims.

## ii.    Shared Confidential Information

Defendants also argue that Plaintiff acted in bad faith by sharing confidential information with Walbridge.  (Defs.' Opp'n, Dkt. [94] at 10-14.) Defendants first argue, "[Plaintiff] admits it mixed documents between Liberty

17

Mutual's claim file related to the Ft. Stewart job and First National's claim file related to the Ft. Stewart job."  (Id. at 11 (citing 5/2/2012 Dep. of First National Insurance Company of America; Designee: Gene Sawyer ("Sawyer Dep"), Dkt. [88] at 102).)  The evidence Defendants cite, however, does not support this assertion.  The testimony cited by Defendants demonstrates that a single document related to the Walbridge account was found in Duncan's underwriting file.  (Sawyer Dep., Dkt. [88] at 98:19-22; 99:1-5; 102:13-16.) Plaintiff's designee, Mr. Gene Sawyer, explained, however, that this was the result of "human error" and contrary to Plaintiff's practice of keeping different claim files separate.  (Id. at 100:2-6; 102:19-20.)  When questioned regarding the Walbridge document that was included in Duncan's claim file, Mr. Sawyer deposed as follows:

> Q.    Okay.  So you think that [Plaintiff] believes there may have been misfiling going on between Walbridge's bond and Duncan's bond?
>
> A.    I can't say conclusively that occurred in this case, but it does happen.  Human error.
>
> Q.    Can [Plaintiff] say conclusively there wasn't cross-filing between Walbridge and Duncan claim bonds?
>
> A.    I couldn't say that.

18

Q.      Could [Plaintiff] say conclusively that there were no
        conversations between those handling Duncan's bond and
        Walbridge's bond?

A.      For myself, [Plaintiff], yes.

Q.      For yourself or for [Plaintiff[?

A.      [Plaintiff].

Q.      How can [Plaintiff] say conclusively that there was no
        communication, but it can't say conclusively there wasn't
        any misfiling?

A.      Well, we don't control what underwriters and could be some
        other departments that have access to our filing system that
        could have been just a simple staff error.

. . .

A.      It is our practice—its basically inferring that we're mixing
        file documents.  That's not the way we do business.

(Id. at 100:2-24; 102:10-12.)

This evidence does not demonstrate bad faith on the part of Plaintiff.  As

stated above, a finding of bad faith requires a showing of "a dishonest purpose

or some moral obliquity," consciousness of wrongdoing, or "some motive of

interest or ill will."  Nguyen, 583 S.E.2d at 223.  The testimony cited by

19

Defendants does not show any such intent or state of mind but demonstrates, on the contrary, one instance of human error.  This does not amount to bad faith.

Defendants further allege that "[Mr. Jason] Stonefeld, the primary handler of the First National claim, specifically contacted Walbridge to tell them to withhold payment to [Duncan] and to tell Walbridge about claims that were being asserted against [Duncan]'s payment bond."  (Defs.' Opp'n, Dkt. [94] at 11 (citing 3/22/2012 Dep. of Jason Stonefeld ("Stonefeld Dep."), Dkt. [82-1] at 40-41 & Stonefeld Dep., Ex. 4 (email from Stonefeld to Walbridge representative), Dkt. [89-4]).)  The email to which Defendants refer, sent by Mr. Stonefeld to a representative of Walbridge, states as follows:

> Mr. DeAngelis—LMS [Liberty Mutual Surety] is the payment and performance bond surety for your subcontractor [Duncan].  The project is the 5th IBCT Complex at Ft. Steward [sic], Georgia.  Duncan's subcontract is 5-1724-0205.  We have received payment bond claims on other projects we bonded for Duncan and we have come to learn that our potential payment bond liability on this job exceeds the amount of the subcontract balance.

> At this time we request [Walbridge] release no further funds to [Duncan] without the express written consent of Liberty Mutual.

> According to Duncan, it just billed $80,784.53 leaving an unbilled balance of $78,435.95.  Please confirm these amounts at your earliest convenience.

20

(Stonefeld Dep., Ex. C, Dkt. [89-4].)[10]

This evidence does not demonstrate that Plaintiff shared confidential communications with Walbridge.  Nor does it show that Plaintiff acted in bad faith with respect to Duncan's interests when it requested that Walbridge not release further payments to Duncan.  On the contrary, as Plaintiff points out (Pl.'s Reply, Dkt. [100] at 11), Defendants pledged to Plaintiff "[a]ny Contract or modification thereof" and any "[m]onies [or] Contract Balances due or to become due Contractor on any Contract" as collateral security for Defendants' agreement to repay Plaintiff's losses and expenses.  (Indemnity Agreement, Dkt. [78-3] at 3 of 11 ("Security to Surety," ¶¶ 1a., 1c.).)  In light of this provision, Plaintiff's request that Walbridge not pay the contract balance to Duncan without Plaintiff's permission cannot be viewed as an act of bad faith.[11]

---

[10] Defendants cite another email to the same effect, in which Plaintiff asks Walbridge to continue holding funds after it received a claim against Duncan's bond from Mainline.  (Stonefeld Dep., Ex. 14. Dkt. [89-14].)  The following analysis applies equally to this evidence.

[11] Defendants also allege that Mr. Stonefeld, in signing the email on behalf of "Liberty Mutual Surety," "clear[ly] intend[ed] . . . to leverage Liberty Mutual's status as Walbridge's surety at the Ft. Stewart project to influence Walbridge to withhold progress payments from [Duncan] related to the Ft. Stewart [sic]."  (Defs.' Opp'n, Dkt. [94].)  This inference is not clear, and there is no other evidence in the record to support such an assertion.

Defendants also point to an email from Mr. Stonefeld to Walbridge and Walbridge's surety as evidence that Plaintiff shared confidential communications with the latter entities.  (See Defs.' Opp'n, Dkt. [94] at 12 ("On June 17, 2010, Stonefeld sent another email to DeAngelis and John Walker, Walbridge's Ft. Stewart Project Manager, specifically referencing the bond issued by Liberty Mutual naming Walbridge as principal." (citing Stonefeld Dep., Ex. 12, Dkt. [89-12])).)  The email reads as follows: "Vince and John—If you receive claims on your Liberty bond from subs and suppliers to Duncan, please forward to my attention.  I will handle the claims on Duncan's payment bond, not Walbridge's."  (Stonefeld Dep., Ex. 12, Dkt. [89-12].)

Again, this email does not demonstrate any sharing of confidential information or other bad faith conduct on the part of Plaintiff.  Indeed, Plaintiff explains that Mr. Stonefeld wrote this email after a supplier of Duncan notified Stonefeld of its intent to file a claim against Duncan's bond but incorrectly provided Walbridge's bond number.  (Pl.'s Reply, Dkt. [100] at 9 (citing Stonfeld Dep., Dkt. [89] at 71-74, 78-79 & Sawyer Dep., Dkt. [88] at 121-123).)  (See also Stonefeld Dep., Ex. 12, Dkt. [89-12] (Stonefeld email

22

forwarding prior email from Duncan supplier, which sought to initiate claims process against Duncan bond but referred to Walbridge bond number).)  The text of this email correspondence and the deposition testimony of Mr. Stonefeld and Mr. Sawyer support Plaintiff's argument that Mr. Stonefeld's email was intended only to ensure that claims on the Duncan bond were properly routed to Plaintiff:  "Stonefeld wrote to Walbridge and its surety to advise that Stonefeld was handling claims on Duncan's bonds and to re-direct any claims they received for Duncan's bonds to him.  Nothing substantive was discussed, but rather it was an attempt to properly route the claim."  (Pl.'s Reply, Dkt. [100] at 9 (citing Stonfeld Dep., Dkt. [89] at 71-74, 78-79 & Sawyer Dep., Dkt. [88] at 121-123).)

Defendants further allege that "[Plaintiff] concedes it can access reports made by Liberty Mutual Insurance Company's attorney defending [Duncan]'s claim against Walbridge and its sureties."[12]  (Defs.' Opp'n Br., Dkt. [94] at 11 (citing Sawyer Dep., Dkt. [88] at 105-06).)  Defendants have put forward no

---

[12] Shortly after Plaintiff initiated this litigation, Duncan filed suit against Walbridge in the United States District Court for the Southern District of Georgia. Duncan Pipeline, Inc. v. Walbridge Aldinger Co., et al., No. 4:11-cv-0092-WTM (S.D. Ga. filed April 7, 2011).  (Pl.'s Br., Dkt. [77-1] at 8 n.8.)

evidence, however, (and indeed do not allege) that Plaintiff actually did access such reports; indeed, the evidence cited by Defendants demonstrates the contrary—that Plaintiff did not, and would not, access such reports.  (Sawyer Dep., Dkt. [88] at 106:16-22, 107:1-5.)  This allegation therefore does not support a finding of bad faith on the part of Plaintiff.

Finally, Defendants allege that a consultant acting on behalf of Plaintiff, Mr. Lin Heath, led Duncan to believe that Plaintiff would assist it in filing a claim against Walbridge (Defs.' Opp'n, Dkt. [94] at 13 (citing Aff. of Ward Duncan ("W. Duncan Aff."), Dkt. [94-10] ¶¶ 8-10)) when, in fact, Plaintiff had no intention of doing so (id. at 13 (citing Stonefeld Dep., Dkt.[89] at 58-62)). Even if the evidence supported these assertions, Defendants have failed to show how these assertions demonstrate bad faith on the part of Plaintiff in paying the claims made against Duncan's Bonds.

Defendants also allege that Mr. Heath suggested an approach to measuring Duncan's damages that "help[ed] Walbridge and Liberty Mutual Insurance Company defend [Duncan]'s claims in the Southern District of Georgia action."  (Id. at 14 (citing W. Duncan Aff., Dkt. [94-10] ¶¶ 11-15).) Defendants contend that this evidence "raises the inference that, under the guise

of investigating [Duncan], [Plaintiff] was gaining valuable information from [Duncan] that could be used to defend future claims on the payment bond issued by Liberty Mutual for the benefit of Walbridge at Ft. Stewart."  (Id.) This evidence does not support the inference that Defendants urge and, again, fails to show bad faith on the part of Plaintiff.  Even if the approach suggested by Mr. Heath has proven detrimental to Duncan in its litigation against Walbridge in the Southern District of Georgia action, there is no evidence that Mr. Heath suggested the approach in bad faith.

### iii.    Breach of Fiduciary Duty

Defendants also argue that Plaintiff was a fiduciary and that it breached its fiduciary duties of loyalty and good faith.  (Defs.' Opp'n, Dkt. [94] at 14-15.)  To show that these duties were breached, Defendants point to testimony of Mr. Stonefeld that "[he] didn't consider [he] had any kind of fiduciary obligation to [Duncan]"; "[wasn't] trying to help [Duncan] finish the job"; and "[was] not concerned with whether [Duncan] [was] able to stay in business or not."  (Id. at 15 (quoting Stonefeld Dep., Dkt. [89] at 74:24-75:1; 75:2-4; 75:5-8).)  Defendants argue, "This testimony . . . is sufficient to create a jury question

as to whether Defendants exercised the duty of good faith it owed to Duncan." (Id.)  Plaintiff argues that it did not stand in a fiduciary relationship with Duncan and therefore did not owe Duncan fiduciary duties.  (Pl.'s Reply, Dkt. [100] at 6-7.)

The Court agrees with Plaintiff that it did not owe Defendants the duties of a fiduciary.  In reaching this conclusion, the Court has considered McLendon v. Hartford Accident & Indemnity Co., 167 S.E.2d 725, 726 (Ga. Ct. App. 1969), which held that the surety in that case owed the indemnitors fiduciary duties of loyalty and good faith.  The Court does not read this case as standing for the proposition that sureties are fiduciaries under all circumstances, and the Court finds no legal basis for imposing upon Plaintiff the duties of a fiduciary in this case.  Thus, the Court concludes that Plaintiff owed Defendants only the duty to act in good faith, not the higher duties of a fiduciary.  See Fidelity & Deposit Co. of MD, No. CV507-42, 2008 WL 5351039, at *7 (S.D. Ga. Dec. 22, 2008) ("The Court has considered the holding in McLendon . . . . [T]he Court can locate no authority for imposing on the surety any duty to the indemnitor beyond what is provided in the indemnity agreement."); Transamerica Ins. Co. v. H.V.A.C. Contractors, Inc., 857 F. Supp. 969, 975

26

(N.D. Ga. 1994) ("The [defendants] baldly assert that plaintiff breached a fiduciary duty to the defendants . . . .  The defendants have cited no authority for the proposition that a surety owes any fiduciary duty to its indemnitors beyond the duties included in the contract."); id. at 975 n.11 ("The Court has found some authority for the proposition that a surety may owe a fiduciary's duty of good faith to the indemnitors.  McLendon v. Hartford Accident & Indemnity Co., 119 Ga. App. 459, 461, 167 S.E.2d 725 (1969).  The contract in question, however, specifically provided for that duty of good faith and the Court has not located any authority which states the surety owes the indemnitors any duty beyond what is already provided in the Agreement of Indemnity.").

> 2.    *Failure to Mitigate Damages*

The second defense that Defendants assert to liability under the Indemnification Agreement is that Plaintiff failed to mitigate damages by failing to collect the contract balances that Walbridge and Bartow owed to Duncan.  (Defs.' Opp'n, Dkt. [94] at 15-21.)  To this end, Defendants argue that Plaintiff took control of Duncan's accounts receivables by directing Walbridge and Bartow to withhold payments from Duncan, thereby obligating itself under

the Uniform Commercial Code (UCC) to collect the contract balances in a commercially reasonable manner.  (<u>Id.</u> at 16-17, 18 (citing O.C.G.A. §§ 11-9-610, 11-9-607).)  Defendants argue that Plaintiff acted in a commercially unreasonable manner when it failed to collect those balances.  (<u>Id.</u> at 20.)

This argument fails.  As a threshold matter, Defendants have failed to show that Plaintiff, by asking Walbridge and Bartow not to direct further payments to Duncan, took such control over Duncan's accounts receivables so as to implicate the UCC provisions on which Defendants rely.  Second, Defendants have pointed the Court to no legal authority for the proposition that Plaintiff was required to collect on Duncan's accounts receivables before reducing its claim to judgment.  This argument accordingly is insufficient to defeat Plaintiff's Motion for Summary Judgment.

### 3.    *Conclusion*

In sum, the Court finds that Plaintiff is entitled to judgment as a matter of law on its claims against Defendants under the Indemnity Agreement. Accordingly, Plaintiffs are entitled to recover from Defendants indemnification

AO 72A
(Rev.8/82)

for all costs, expenses, and fees incurred in paying the Bond claims and

enforcing the Indemnification Agreement.[13]  Plaintiff's Motion for Summary

---

[13] Plaintiff seeks to recover $839,769.49, which amount is itemized in the Stonefeld Affidavit.  (Dkt. [78] ¶¶ 14-15.)  Defendants contend that the Stonefeld Affidavit is insufficient evidence of the amount to which Plaintiff is entitled under the Indemnification Agreement.  (Defs.' Opp'n, Dkt. [94] at 21-25.)  The Indemnification Agreement provides that Defendants shall accept "[a]n itemized statement of loss and expense incurred by Surety, sworn to by an officer of Surety," as "prima facie evidence of the fact and extent of the liability of [Defendants] to Surety in any claim or suit by Surety against [Defendants]."  (Dkt. [78-3] at 2 of 11.)

Defendants first argue that the Stonefeld Affidavit is insufficient because Mr. Stonefeld is not an employee of Plaintiff and therefore not an "officer of Surety." (Defs.' Opp'n, Dkt. [94] at 21-22.)  Mr. Stonefeld deposed, however, that he acted as "senior claims counsel" and "home office counsel" for Plaintiff.  (Stonefeld Dep., Dkt. [89] at 14-18, 24.)  He further states in his affidavit that he is "responsible for managing claims against bonds issued by [Plaintiff]" and that his "responsibilities include serving as the custodian of records . . . including but not limited to records related to the bonds issued for [Duncan] and claims against such bonds."  (Stonefeld Aff., Dkt. [78] ¶ 3.)  Based on this evidence, the Court finds Mr. Stonefeld a proper affiant under the Indemnity Agreement.  <u>See</u> <u>Anderson</u>, 600 S.E.2d at 628 (finding claims attorney to be sufficient affiant under Indemnity Agreement, which called for an itemized statement "sworn to by an officer of surety," where evidence showed claims attorney to have been the "official in charge" of the bond claim).

Defendants next argue that the Stonefeld Affidavit is not prima facie evidence of the amounts Plaintiff paid in attorneys and consulting fees.  (Defs.' Opp'n, Dkt. [94] at 23-24.)  As stated above, however, the Indemnification Agreement provides that such a sworn statement would be prima facie evidence of the "fact and extent of the <u>liability of Defendants to [Plaintiff] in any claim or suit by [Plaintiff] against [Defendants].</u>"  Such liability includes Defendants' liability to Plaintiff for attorney's fees and consulting costs, for which fees and costs Defendants are obligated to indemnify Plaintiff.  (Indemnification Agreement, Dkt. [78-3] at 2 of 11.)  Moreover, apart from the terms of the Indemnification Agreement, a sworn affidavit is admissible evidence and therefore may be used to establish the amount of attorneys fees and

Judgment is **GRANTED**.

## II.      Defendants' Motion for Leave to File Counterclaim [81]

Defendants move the Court for leave to file counterclaims for tortious interference (Count I); non-compliance with Uniform Commercial Code (Count II); bad faith (Count III); breach of fiduciary duty (Count IV); punitive damages (Count V); and attorneys fees pursuant to O.C.G.A. § 13-6-11 (Count VI). (Defs.' [Proposed] Counterclaim Against First National Insurance Company of America ("Defs.' Proposed Counterclaim"), Dkt. [81-3].)  Each of these proposed counterclaims is based on the allegations that Plaintiff (1) directed Walbridge and Bartow to withhold progress payments from Duncan and (2) failed to make any effort to collect these payments.  (Id. ¶¶ 4-18.)  Defendants argue they were unaware of the foregoing facts until Plaintiff's May 2012

---

consulting costs incurred by Plaintiff.

Finally, Defendants argue that they are entitled to unredacted bills for attorneys' fees.  (Defs.' Opp'n, Dkt. [94] at 24-25.)  The Court agrees with Plaintiff that Defendants have failed to object to the attorneys' fees bills in a timely fashion. As Plaintiff states, Plaintiff produced redacted bills to Defendants in response to discovery requests and received no objection from Defendants during discovery. (Pl.'s Reply, Dkt. [100] at 16.)  The time for Defendants to object to the redacted bills was during discovery, not at summary judgment.

In short, Defendants' objections to the Stonfeld Affidavit are without merit.

30(b)(6) deposition and, therefore, are entitled to assert these counterclaims under Federal Rule of Civil Procedure ("Rule") 13(e)[14] and 15(a)[15].

Plaintiff argues that Rule 13(a) does not apply in this case because Defendants' proposed counterclaims did not accrue after Defendants filed their Answer, on June 8, 2011, but rather accrued in 2010, when Plaintiff directed Walbridge and Bartow to withhold funds from Duncan.  (Pl.'s Resp. in Opp'n to Mot. for Leave to File Counterclaim ("Pl.'s Opp'n"), Dkt. [92] at 2-3, 14-16.) On the contrary, Plaintiff contends that Rule 16(b)[16] and its "good cause" standard governs the Court's analysis of Defendants' Motion for Leave to File Counterclaim because the Motion has been filed after the Court's Scheduling Order deadline.  (See generally id.)  Finally, Plaintiff argues that Defendants cannot show good cause for filing their Motion at this late date because Defendants were not diligent in asserting their counterclaims; to this end,

---

[14] Rule 13(e) provides, "The court may permit a party to file a supplemental pleading asserting a counterclaim that matured or was acquired by the party after serving an earlier pleading."  Fed. R. Civ. P. 13(e).

[15] Rule 15(a) provides that in cases where an amendment is not permitted as a matter of course, "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).

[16] Rule 16(b) provides, in pertinent part, that "[a] [scheduling order] may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).

31

Plaintiff contends that Defendants knew of the facts giving rise to their proposed counterclaims in 2011 and yet failed to assert them until after the close of discovery and deadline for filing motions for summary judgment.  (Id. at 9-14.)

The Court agrees with Plaintiff that Rule 16(b) governs Defendants' Motion for Leave to File Counterclaim since the Motion was filed beyond the deadline imposed by the Court's Scheduling Order (Dkt. [17]) and the Local Rules of this Court.[17]  Under Local Rule 7.1A(2), a motion for leave to amend "must be filed WITHIN THIRTY (30) DAYS after the beginning of discovery unless the filing party has obtained prior permission of the court to file later." The discovery period in this case commenced on July 8, 2011, thirty days after Defendants filed their Answer (on June 8, 2011), in accordance with Local Rule 26.2A, which provides that discovery "shall commence thirty (30) days after the appearance of the first defendant by answer to the complaint . . . ."  Thus, under the Court's Scheduling Order, Defendants' Motion for Leave to File Counterclaim should have been filed on or before August 8, 2011, thirty days

---

[17] The Scheduling Order provides that motions shall be filed in accordance with the Local Rules of this Court.  (Dkt. [17] at 5 ¶ 7.)

after commencement of the discovery period, absent permission from the Court to file at a later date.  Defendants' Motion was not filed, however, until June 13, 2012.  Thus, Rule 16 applies.  See Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1418 n.2 (11th Cir. 1998) ("[W]hen a motion to amend is filed after a scheduling order deadline, Rule 16 is the proper guide for determining whether a party's delay may be excused.").

As stated in footnote 16, supra, under Rule 16(b), a scheduling order may be modified "only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  "This good cause standard precludes modification unless the schedule cannot be met despite the diligence of the party seeking the extension."  Sosa, 133 F.3d at 1418 (internal quotes and citation omitted).  Thus, "'[i]f a party was not diligent, the good cause inquiry should end.'"  Id. (quoting Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992)).

The Court agrees with Plaintiff that Defendants were not diligent in seeking to file their counterclaims and therefore cannot show good cause for asserting them at this late stage in the litigation.  In an attempt to establish good cause, Defendants argue they were not aware of the facts giving rise to their

proposed counterclaims until Plaintiff's 30(b)(6) deposition in May 2012.

(Defs.' Mot. for Leave to File Counterclaim, Dkt. [81] at 8.)  Evidence in the

record belies this assertion.  In her November 10, 2011 deposition, Defendant

Dawn Duncan testified that Mr. Stonefeld had asked Walbridge to withhold

further payments from Duncan.  (11/10/2010 Dep. of Dawn Duncan ("D.

Duncan Dep."), Dkt. [84] at 41:13-23; 42:19-23; 44:1-9.)  Similarly, Defendant

Ward Duncan testified in his deposition that Plaintiff had instructed Walbridge

and Bartow to withhold payments from Duncan.  (11/10/2011 Dep. of Ward

Duncan ("W. Duncan Dep."), Dkt. [86] at 28:4-8; 35:5-15.)  Mr. Duncan further

testified at his deposition that he had received emails in which Plaintiff

instructed Walbridge to withhold the payments from Duncan.  (Id. at 39:4-13.)

Finally, Mr. Duncan opined that Plaintiff should have sought to collect the

monies that Walbridge and Bartow owed Duncan.  (W. Duncan Dep., Dkt. [86]

at 40:23-41:6; 54:24-55:13.)

The deposition testimony of Dawn and Ward Duncan demonstrates that

Defendant knew of the operative facts giving rise to Defendants' proposed

counterclaims at least as of November 10, 2011.  And Defendants concede as

much: "[I]t is true that Defendants were aware in November 2011 that Plaintiff

had directed Walbridge and Bartow County not to send progress payments to [Duncan] in May and June 2010 . . . ."  (Defs.' Reply Br. in Further Supp. of their Mot. for Leave to File Counterclaim ("Defs.' Reply"), Dkt. [96] at 4.) Although Defendants might not have known each specific detail related to their counterclaims at this date, they were on notice of their potential claims and had ample opportunity to conduct discovery regarding them.[18]  Thus, Defendants did not act diligently when they failed to seek leave to amend the Court's Scheduling Order and assert their proposed counterclaims until June 13, 2012. Because Defendants have failed to show good cause for filing their Motion for Leave to File Counterclaim at this late stage in the litigation, the Motion is **DENIED**.

### Conclusion

In accordance with the foregoing, Plaintiff's Motion for Summary Judgment [77] is **GRANTED** and Defendants' Motion for Leave to File

_____

[18] In this regard, the Court notes that it extended the discovery period three times in this case such that discovery did not close until May 14, 2012.  (See Am. Scheduling Order, Dkt. [53] (extending discovery through January 31, 2012); Second Am. Scheduling Order, Dkt. [58] (extending discovery through April 13, 2012); Third Am. Scheduling Order, Dkt. [71] (extending discovery through May 14, 2012).)

AO 72A
(Rev.8/82)

Counterclaim [81] is **DENIED**.  The Clerk is directed to enter judgment in favor of Plaintiff and against Defendants in the sum of $839,769.49, plus costs.

   **SO ORDERED**, this   19th   day of February, 2013.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

36